OPINION
{¶ 1} Defendant-appellant, Darikus Y. Norwood, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict, of one count of aggravated robbery with a firearm specification, two counts of robbery, and one count of kidnapping. Because the sufficiency and weight of the evidence support the trial court's judgment, we affirm.
 {¶ 2} According to the state's evidence, on September 11, 2002, at approximately 1:45 a.m., four individuals robbed, at gunpoint, the Duke Dutchess convenience store, located on Sunbury Road in Westerville. Tom Moorehead, a clerk at the store, was working at the time. When he heard someone come in the store, he turned around, only to find himself "looking into a shotgun." (Tr. 27-28.) The man with a white mask holding the shotgun commanded him to open the safe. While Moorehead noticed two other individuals participating in the robbery, he eventually determined, as they left the store, that four persons participated in the robbery: three males and one female. Moorehead testified the robbery lasted approximately three and one-half to four minutes before the perpetrators left in an older maroon and silver car. He stated he did not attempt to stop the robbery because he "didn't want to argue with the shotgun." (Tr. 34.)
 {¶ 3} When the Westerville police arrived, they interviewed Moorehead, obtained the videotape from the store's surveillance system, recovered fingerprint evidence from a carton of cigarettes that one of the robbers had touched during the robbery, and dusted the store for further fingerprints. The multiplex surveillance video was "deplexed" into a normal VCR tape and also was made into still shots by an expert at the Columbus Police Department, and the fingerprint lifts were entered into the Columbus Police Department's AFIS fingerprint computer system. Ultimately, fingerprints found on the carton of cigarettes positively matched those of Jarreau Upchurch.
 {¶ 4} The Westerville police immediately set up surveillance around Upchurch's residence in an attempt to locate and arrest him. On September 13, 2002, two days after the robbery, the surveillance team observed much activity around the Upchurch apartment. A "red maroonish type Kia," later identified as defendant's car, pulled up to the address, and several males and at least one female continually walked back and forth between the car and the residence. (Tr. 75.) Eventually, one of the males, fitting Upchurch's description, and a female walked a block to the Dairy Mart. Defendant's Kia, with a female passenger, joined the group that had formed in the Dairy Mart parking lot.
 {¶ 5} Believing Jarreau Upchurch to be at the Dairy Mart, the Westerville police made a felony stop. Although the person they believed to be Upchurch was Upchurch's brother, the detectives noticed the female riding in the Kia, Shennell Mallory, was wearing the same clothes the female robber in the surveillance video wore on the night of the robbery. When a detective confronted Mallory with a robbery photograph and said, "I can't believe you're wearing the same clothes today that you had on during the robbery[,]" she responded with a smile and "just said well I haven't had them on ever since then. I actually changed them and washed them, but yes." (Tr. 100.) Her response resulted in further interrogation of Mallory and an investigation of both defendant and his car.
 {¶ 6} During the course of the police investigation, a number of items were collected from defendant's Kia, including a very large knife with a wooden handle, a large wooden cane identical to the cane Mallory used during the robbery, six shotgun shells, a box of shotgun shells located separately from the six, a black hat, and a pair of white Reebok tennis shoes with a tread pattern matching that found at the crime scene. In addition to the items found in defendant's car, Mallory admitted to authorities that defendant participated in the crime, and she gave the police a statement consistent with her admission.
 {¶ 7} The investigation of the robbery of the Duke Dutchess gave rise to a four-count indictment filed September 23, 2002, charging defendant with one count of aggravated robbery in violation of R.C. 2911.01, two counts of robbery in violation of R.C. 2911.02, and one count of kidnapping in violation of R.C.2905.01. Each count carried a firearm specification pursuant to R.C. 2941.141. The matter was tried to a jury starting on February 18, 2003, and the jury found defendant guilty on all counts and specifications; the trial court sentenced defendant accordingly. Defendant appeals, assigning two errors:
First Assignment of Error
Appellant's convictions are against the manifest weight of the evidence.
Second Assignment of Error
The finding that Appellant possessed and used a firearm, as the term is defined by R.C. 2923.11(B)(1), is not supported by sufficient evidence.
 {¶ 8} Defendant's first assignment of error contends his convictions are against the manifest weight of the evidence. When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. Statev. Thompkins (1997), 78 Ohio St.3d 380, 387 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); State v.Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Only when an appellate court determines that a reasonable juror could not find a witness's testimony to be credible is it appropriate for a court to interfere in the factual finding of the jury.Conley, supra.
 {¶ 9} According to Mallory's testimony at trial, on the night of September 10 and the early morning hours of September 11, 2002, she, defendant, Jarreau Upchurch, and Cory Johnson were riding around in defendant's Kia. Upchurch and Johnson wanted "to do a robbery"; they interested Mallory in the endeavor, but were unable to interest defendant. (Tr. 126.) The three finally talked defendant into taking part, and the group rode around looking for a car to steal in order to commit the robbery. They found a car, Johnson hotwired it, and they drove it away. While Johnson and Upchurch rode in the stolen car, Mallory and defendant deposited the Kia in a nearby McDonald's parking lot so it would not be associated with the robbery. Driving the stolen car, Johnson picked up Mallory and defendant, and the four of them drove around until they agreed upon a place to rob.
 {¶ 10} Mallory testified that the group decided to rob the Duke Dutchess store because "nobody was barely there." (Tr. 134.) On entering the store, each of them had a special assignment: "I [Mallory] was being a watcher and I took a couple of things. Cory [Johnson], he was looking for the safe. Jarreau [Upchurch], he was holding a shotgun up to the man's head that was working there telling him to go get the tape. But he was saying there was no tape. And Darikus [defendant] was getting the money [from the register]." (Tr. 135.) During the robbery, defendant was carrying a .38 caliber handgun and Mallory had a large cane.
 {¶ 11} Mallory testified that after the robbery she fell asleep in the stolen car. When she awoke, she was in the front seat of the Kia at Upchurch's apartment; everyone else was talking outside. She still had the cane with her in defendant's car, but she did not see either the shotgun or the .38 caliber handgun after the night of the robbery.
 {¶ 12} In contrast to the state's evidence, defendant testified he did not participate in the robbery, as he was not that kind of person; he was an honor roll caliber student with a steady job history, a high school diploma, and plans to begin college classes at Columbus State on September 25, 2002. Defendant admitted discussing "doing the robbery" with Upchurch, Johnson, and Mallory, but denied helping them commit the offense. (Tr. 155.) Rather, defendant testified he dropped off Mallory at Upchurch's apartment between 12:30 and 12:45 a.m. and returned home to let his parents know he was in the house. According to defendant, after taking his brothers to school on the morning of the September 11, he went to Upchurch's to check on Mallory; at that point he learned about the robbery.
 {¶ 13} Defendant testified that he knew Upchurch and Johnson had reputations for committing robberies, but explained he maintained relationships with them because Upchurch is his cousin. Defendant did not know how the physical evidence got into the trunk of his car; he could only hypothesize that someone else was responsible because he often gave his car keys to others, such as Upchurch and Mallory. Finally, defendant suggested Mallory's testimony should not be believed because she was mentally unstable as evidenced by her suicidal tendencies, was too young to give mature testimony, and would have changed her story but for the prosecution's threat to try her as an adult.
 {¶ 14} In his first assignment of error, defendant does not challenge the evidence concerning any particular element of the offenses for which he was convicted. Rather, defendant contends Mallory's testimony is so inherently unreliable that no reasonable juror could find it credible. In particular, defendant points to the agreement Mallory reached with the prosecution that ensured Mallory would be treated as a juvenile in the resolution of the charges arising out of the robbery. Defendant further notes that although Mallory testified in accord with her statement to the police, on the morning of trial she would have recanted but for the prosecution's threat to try her as an adult, with the accompanying possibility of a 15-year sentence. According to the record, Mallory wanted to testify that defendant did not participate in the robbery; rather, someone disguised as defendant was among the group that robbed the convenience store.
 {¶ 15} Defendant's appeal thus is premised on divergent testimony that raises credibility issues for the jury to determine. The state presented the jury with the testimony of Mallory, an admitted participant in the robbery, who stated defendant played a role in the holdup. As a close friend of defendant, she had no motive apart from the ramifications of her agreement with the prosecution to falsely incriminate him. Mallory's statement to the police was identical to her trial testimony, and her testimony was corroborated, in part, by store surveillance video, fingerprint evidence recovered from the scene, and one item found in defendant's car that admittedly was used during the commission of the offense.
 {¶ 16} Defendant presented the jury with evidence that he did not participate in the robbery, but instead was at home in bed and did not find out about the robbery until the next day. According to defendant, he did not know how the physical evidence got into his car, but offered that he frequently loaned his car keys to Mallory and Upchurch. Apparently recognizing credibility issues would determine the outcome of the trial, defendant supported his testimony with evidence that he was an upstanding citizen, while Mallory was mentally unstable, immature, and unable to testify as she would have liked, even though she admitted the testimony would have been a lie, because of a prosecutorial threat.
 {¶ 17} The jury's verdict discloses the jury chose to believe Mallory and the state's corroborating evidence, despite the evidence that impeached Mallory's testimony, and to give little weight to defendant's testimony. While defendant's attempt to sway the jury to disbelieve Mallory was proper, the jury rejected it in its final factual determination. As such, this court may not appropriately interfere, as we cannot say the jury lost its way in finding the state's evidence credible. Accordingly, defendant's first assignment of error is overruled.
 {¶ 18} Defendant asserts in his second assignment of error that the trial court erred in holding he possessed and used a firearm during the robbery because proof of the firearm's operability, as required by R.C. 2923.11(B)(1), was not supported by sufficient evidence. In reviewing defendant's assertion, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; Conley, supra.
 {¶ 19} According to R.C. 2923.11(B)(1), "`[f]irearm' means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." With respect to determining operability, R.C.2923.11(B)(2) instructs that a jury may rely upon circumstantial evidence, "including, but not limited to, the representations and actions of the individual exercising control over the firearm." Pursuant to the statute, implicit threats made by the person in control of the firearm can be taken into account: "where an individual brandishes a gun and implicitly but not expressly threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable." Thompkins, at 384.
 {¶ 20} Here, although Mallory testified defendant was carrying a .38 caliber handgun during the robbery, the state focused on another of the offenders who used a shotgun to commit the offense. Specifically, when Tom Moorehead turned around at the Duke Dutchess, he was "looking into a shotgun"; he did not try to stop the robbery because he "didn't want to argue with the shotgun." (Tr. 27-28, 34.) From Moorehead's testimony, the jury properly could conclude that Moorehead believed the firearm pointed at his head was operable and capable of causing him grave harm. Accordingly, on this evidence, a rational trier of fact could find beyond a reasonable doubt the essential elements of the firearm specification against defendant. State v. Chapman
(1986), 21 Ohio St.3d 41 (concluding that "[a]n individual indicted for and convicted of R.C. 2911.01, aggravated robbery, and R.C. 2941.141, a firearm specification, is subject to a mandatory three-year term of actual incarceration * * * regardless of whether he was the principal offender or an unarmed accomplice"). Id. at syllabus. Defendant's second assignment of error is overruled.
 {¶ 21} Because the sufficiency and the weight of the evidence support defendant's convictions, we overrule defendant's two assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
Brown and Wright, JJ., concur.